# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-2697

_____

United States of America,            \*

                      \*

        Appellee,        \*

                      \*   Appeal from the United States

    v.               \*   District Court for the

                      \*   District of South Dakota.

Joe Bradley,              \*

                      \*

        Appellant.      \*

_____

Submitted:  February 16, 2011
Filed: July 12, 2011

_____

Before RILEY, Chief Judge, WOLLMAN and BYE, Circuit Judges.

_____

BYE, Circuit Judge.

Joe Bradley appeals his conviction by a jury of conspiracy to distribute a controlled substance in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(B), and distribution of a controlled substance in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(C). Bradley contends there was insufficient evidence to support his convictions. He also appeals the sentence of 60 months' imprisonment imposed by the district court[1] based on the court's drug quantity calculation and its refusal to apply a two-level minor participant reduction. We affirm in all respects.

_____

[1]The Honorable Karen E. Schreier, Chief Judge, United States District Court for the District of South Dakota.

I

Joe Bradley was charged with conspiracy to distribute cocaine and distribution of cocaine due to his connection to narcotics dealers in Rapid City, South Dakota, in late 2008. Bradley's involvement in the conspiracy arose from his relationship with Ben Stockman, a long-time friend and co-conspirator of Lindsey Potratz. According to Potratz, Stockman sold cocaine for him in quantities of at least an ounce at a time, and up to 10 or 11 ounces at one point. Around June 2008, Potratz asked Stockman to deliver a large quantity of cocaine to another dealer in Sioux Falls, South Dakota. Stockman agreed to carry out the request, but informed Potratz he had a number of customers who needed to be "taken care of" while he was gone, including Bradley. Potratz correspondingly made contact with Bradley and delivered to him between a quarter-ounce and a half-ounce of cocaine, with additional sales occurring during Stockman's two-week absence.[2]

In mid to late August 2008, Bradley was introduced to Alana Shelton at a party. Bradley asserts he was unaware at the time Potratz had been Shelton's off-and-on drug supplier for about 10 years. Potratz previously sold Shelton ecstasy, which, in turn, she distributed to others. In addition, Shelton regularly purchased cocaine from Stockman. However, in Stockman's absence, Shelton testified she was able to obtain cocaine from Bradley, and accordingly she purchased an "eightball" (three and one-half grams) of cocaine directly from Bradley two or three times.

In September of 2008, about three weeks after they met, Bradley moved into Shelton's apartment. At that point, Potratz began selling half-ounce quantities of

---

[2]Bradley asserts Potratz was unable to confirm many details of these sales, including when and where the two men met, the quantity and cost of the cocaine, and whether Bradley paid for the cocaine in full at the time of delivery. Bradley also attacks the inconsistencies concerning dates, quantities, and other transactional details between Potratz's testimony and the testimony of Alana Shelton.

cocaine to both Shelton and Bradley one to two times per week. According to Potratz, this arrangement continued for six to eight weeks until Bradley "left town." Shelton also confirmed the arrangement in her testimony, noting Potratz would generally make the deliveries to her and Bradley at the same time, but she and Bradley would keep their drugs and money separate because each had their own customer base. In sum, Potratz estimated he sold about four kilograms of cocaine from June to September of 2008 for redistribution to Bradley, Shelton, Stockman, and others. Potratz estimated Bradley was personally responsible for nine to twelve ounces of cocaine.

In addition to the testimony of Potratz and Shelton, the government presented testimony from Michael Wiseley, who was serving a three-year sentence for distribution of methamphetamine. Wiseley testified he met Bradley through Stockman, who had sold cocaine to Wiseley on prior occasions. According to Wiseley, Stockman informed him he could obtain cocaine from Bradley in Stockman's absence. Following this suggestion, on two separate occasions, Wiseley purchased eightballs of cocaine from Bradley around August 2008.

Based upon the foregoing testimony, the jury convicted Bradley on the conspiracy and distribution counts. After agreeing with the drug quantity calculation contained in the Presentence Report (PSR), the district court concluded Bradley was responsible for 241.4 grams of cocaine in the conspiracy. Consequently, the court calculated a base offense level of 20 for distribution of at least 200 grams but less than 300 grams of cocaine. The court also determined Bradley was not a minor participant in the conspiracy because it was holding him responsible for only those quantities he and Shelton were involved with, and therefore he was not "less culpable" than most other participants. Combined with Bradley's criminal history category IV, the court arrived at a Guidelines range of 51 to 63 months. Ultimately, the court imposed a sentence of 60 months on each count, to run concurrently. It also designated that 10 months of Bradley's sentence would run concurrent to his undischarged state sentence. Bradley appeals his conviction and his sentence.

II

Bradley first argues the district court erred by denying his motion for acquittal on both counts because the government presented insufficient evidence to establish he joined a drug conspiracy or distributed cocaine. "'We review the denial of a motion for a judgment of acquittal *de novo*.'" United States v. Johnson, 619 F.3d 910, 920 (8th Cir. 2010) (quoting United States v. El Herman, 583 F.3d 576, 579 (8th Cir. 2009)). "We must determine whether 'any rational trier of fact could have found' that the evidence established the essential elements of the charged crime beyond a reasonable doubt." United States v. Aponte, 619 F.3d 799, 804 (8th Cir. 2010) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). "We consider the evidence in the light most favorable to the government, drawing all reasonable inferences and resolving all evidentiary conflicts in favor of the jury's verdict." Id.

"'To establish that a defendant conspired to distribute drugs . . . the government must prove: (1) that there was a conspiracy, i.e., an agreement to distribute the drugs; (2) that the defendant knew of the conspiracy; and (3) that the defendant intentionally joined the conspiracy.'" United States v. Ojeda-Estrada, 577 F.3d 871, 875 (8th Cir. 2009) (quoting United States v. Jiminez, 487 F.3d 1140, 1146 (8th Cir. 2007)). "'[A] defendant may be convicted for even a minor role in a conspiracy, so long as the government proves beyond a reasonable doubt that he or she was a member of the conspiracy.'" United States v. Garcia, 569 F.3d 885, 888 (8th Cir. 2009) (quoting United States v. Lopez, 443 F.3d 1026, 1030 (8th Cir. 2006)). Similarly, to prove the defendant illegally distributed a controlled substance, the government must prove (1) the defendant knowingly and intentionally distributed the controlled substance to another person and (2) the defendant knew at the time of distribution it was a controlled substance. United States v. Olguin, 428 F.3d 727, 728 (8th Cir. 2005).

Bradley asserts he was convicted of conspiracy based entirely on the testimony of Potratz and Shelton, who both admitted at trial they had been buying, using, and

selling drugs in substantial quantities for almost 10 years. Moreover, both were testifying pursuant to their cooperation with the government in the hopes of receiving reduced sentences. Bradley also claims their testimony was unsubstantiated and contained many inconsistent and conflicting details. For instance, Bradley asserts Potratz was unable to name a single person he claimed Bradley sold cocaine to in the conspiracy, and he was only able to identify his own associates such as Shelton, Stockman, and others. Similarly, Bradley claims Shelton was unable to name anyone other than herself he sold cocaine to, and her testimony conflicted with her later testimony as to her purchase of cocaine from Potratz and Stockman at the time and with a letter she had written denying Bradley's involvement. In addition, Bradley claims he worked long hours at a tattoo parlor during the pendency of the alleged deals, and thus it was unlikely Potratz made the deals in person to him as Potratz claimed.

On the distribution count, Bradley criticizes Wiseley as an admitted methamphetamine addict who agreed to cooperate with the government to avoid a lengthy sentence himself. According to Bradley, Wiseley testified at trial he bought user amounts of cocaine from Bradley twice, despite having previously testified before the grand jury he bought cocaine from Bradley three or four times. Bradley also notes Wiseley was unable to remember quantities sold, prices paid, where the sales occurred, and whether he had even paid for the cocaine. Moreover, Bradley claims Wiseley's drug of choice was methamphetamine, and thus it was unlikely Wiseley would have purchased cocaine from Bradley.

After careful review of the record, we conclude the evidence produced at trial, when viewed in the light most favorable to the government, was sufficient to establish the elements of Bradley's convictions for conspiracy and distribution. Shelton's testimony indicated Bradley assisted Stockman in making distributions of cocaine, and additionally, Bradley was selling to his own customer base. Potratz detailed his distribution of substantial amounts of cocaine to Bradley on a weekly basis in

quantities costing Bradley between $500 and $600 at a time. Moreover, Potratz was aware Bradley was selling this cocaine to other customers. In sum, the evidence illustrates this is not a case involving a mere buyer-seller relationship, such as United States v. Jensen, 141 F.3d 830, 833 (8th Cir. 1998). Finally, both Shelton and Wiseley confirmed they could obtain cocaine from Bradley in Stockman's absence, and each did so on multiple occasions.

Bradley's arguments are properly characterized as attacks on the jury's credibility determinations, which are "virtually unassailable on appeal." United States v. Samuels, 611 F.3d 914, 917 (8th Cir. 2010) (internal quotation marks and citation omitted); see also United States v. Listman, 636 F.3d 425, 430 (8th Cir. 2011) ("The jury is the final arbiter of the witnesses' credibility, and we will not disturb that assessment.") (internal quotation marks and citation omitted). "'On numerous occasions we have upheld jury verdicts based solely on the testimony of cooperating witnesses.'" Samuels, 611 F.3d at 917 (quoting United States v. Vickers, 528 F.3d 1116, 1120 (8th Cir. 2008)). Bradley "has not shown that this is the rare case where 'no reasonable person could believe the incriminating testimony.'" Id. (quoting United States v. Watson, 952 F.2d 982, 988 (8th Cir. 1991)).

Indeed, in previous cases we have rejected arguments similar to Bradley's. For instance, in United States v. Malloy, 614 F.3d 852, 861 (8th Cir. 2010), the defendant argued, as Bradley does here, "the witnesses who testified against him at trial were not credible, that their testimony was confusing and contradictory, and that their testimony was not corroborated by independent evidence." We concluded "[n]one of these arguments are within our scope of review, as we do not weigh the evidence or consider the credibility of witnesses when reviewing the denial of a motion for judgment of acquittal; such questions are for the jury." Id. We reached the same conclusion in United States v. Hodge, 594 F.3d 614, 618 (8th Cir. 2010), where the defendant argued the government's witnesses provided inconsistent testimony, were incredible because of their incentive for reduced sentences, and were unreliable

because of their drug addictions. We rejected these claims, noting "[a] jury's credibility determinations are well-nigh unreviewable because the jury is in the best position to assess the credibility of witnesses and resolve inconsistent testimony." Id.

In both Malloy and Hodge, we determined minor inconsistencies in witnesses' testimony do not require acquittal. See Malloy, 614 F.3d at 861 ("[w]hile some of the coconspirators' testimony may have contained minor inconsistencies, it was not so incredible as to require acquittal."); Hodge, 594 F.3d at 618 ("Only when credibility determinations are internally inconsistent, based upon incoherent or implausible testimony, or directly at odds with objective evidence is a more searching review warranted."). While Bradley attempts to place this case outside the "realm of credibility," see United States v. Jones, 418 F.2d 818, 826 (8th Cir. 1969), we conclude this matter is similar in relevant respects to Malloy and Hodge; consequently, the minor inconsistencies in the testimony of Potratz, Shelton, and Wiseley do not warrant acquittal because it was within the jury's province, as the finder of fact, to resolve these inconsistencies and to accord what weight it desired to the testimony. Moreover, the jury had before it the fact the witnesses were cooperating with the government in the hopes of receiving favorable sentences, as well as their prior drug abuse and addiction. Viewed in the light most favorable to the government, there is no basis upon this record to disturb the jury's findings. Thus, the court did not err in denying Bradley's motion for judgment of acquittal.

III

Bradley next challenges two determinations made by the court at sentencing. First, he contends the court erred in calculating the drug quantity attributed to him. Second, Bradley asserts the court should have applied a two-level reduction because he was a minor participant in the conspiracy. Each will be addressed in turn.

A. The District Court's Drug Quantity Calculation

"'The government bears the burden of proving drug quantity by a preponderance of the evidence.'" Johnson, 619 F.3d at 921 (quoting United States v. Marshall, 411 F.3d 891, 894 (8th Cir. 2005)). "Drug quantity findings are findings of fact that are reviewed for clear error, and we must affirm unless the entire record firmly convinces us that a mistake has been made." Id. (internal quotation marks and citation omitted). "In a drug conspiracy case, the district court may consider amounts from drug transactions in which the defendant was not directly involved if those dealings were part of the same course of conduct or scheme." United States v. Rodriguez, 484 F.3d 1006, 1014 (8th Cir. 2007) (internal quotation marks and citation omitted). "The Guidelines permit a district court to approximate the quantity of drugs for sentencing purposes where . . . there has been no direct seizure of drugs directly establishing the relevant amount." United States v. Zierke, 618 F.3d 755, 761 (8th Cir. 2010) (internal quotation marks and citation omitted). "Moreover, the court can determine drug quantity using imprecise evidence, so long as the record reflects a basis for the court's decision." Id.

The jury found Bradley was responsible for less than 500 grams of cocaine in finding him guilty of the conspiracy charge. In calculating the drug quantity attributable to Bradley, the PSR stated there was no information placing Bradley in the conspiracy prior to September 2008. As a result, the PSR only included as relevant conduct Bradley's association with Potratz from September 1, 2008, to November 7, 2008, the date Bradley was arrested and detained. According to the PSR's estimation, Potratz delivered one-half ounces of cocaine to Bradley once per week, resulting in Bradley being personally responsible for obtaining and distributing 127.8 grams of cocaine (14.2 grams per week for nine weeks). The PSR also included cocaine distributed by Potratz to Shelton during the same time, which was approximately 113.6 grams due to Shelton's arrest on October 30, 2008 (14.2 grams per week for eight weeks). In sum, the PSR concluded Bradley was responsible for

obtaining and distributing 241.4 grams. The district court agreed with this determination, overruling Bradley's objection to the PSR's calculation.

Bradley contends the court's finding was clearly erroneous, and he requests the drug quantity be reduced to 100 to 200 grams, placing him at a base offense level of 18, instead of the level 20 he was assigned. According to Bradley, the evidence did not support his involvement in the conspiracy until mid-September, at the earliest, coinciding with the date he moved into Shelton's apartment. As for the date of termination, Shelton testified she last had contact with Bradley on November 3, 2008, which is the date she claims to have been arrested. However, Bradley asserts this date was no later than October 30, 2008, which is the day Shelton was arrested according to his PSR. In addition, Potratz testified he had no contact with Bradley after Bradley "left town," which the PSR estimated to be November 7, 2008, when Bradley was jailed on a parole violation. Bradley claims the correct date was October 22, 2008, when he fled from his probation officer and failed to return to Shelton's apartment.

Taken together, Bradley calculates a period of six weeks of his involvement in the conspiracy, rather than the nine weeks contemplated by the district court. Therefore, he argues he should have been responsible for only 170.4 grams of cocaine for sentencing purposes, which includes the amount attributed to Shelton (28.4 grams per week for six weeks). This calculation would lower his Guidelines range from 51 to 63 months to 41 to 51 months.

We conclude the district court's findings are supported by the record. Potratz testified Stockman rejoined his crew in May or June of 2008, or "maybe a little before." Trial Tr. Vol. 1, 14. "Soon after" this point, Potratz was introduced to Bradley. Id. at 54. Approximately three months later, Stockman left for Sioux Falls and Potratz assumed the role as the primary contact for Bradley, placing the time frame around August to September of 2008. Id. at 20. Potratz testified Stockman was in Sioux Falls for "about two weeks," and during that time, Potratz began selling

directly to Bradley. Id. at 24-25. "[T]wo weeks to a month" after Potratz began dealing to Bradley, he realized Bradley was acquainted with Shelton after he stopped by Shelton's house. Id. at 26-27. After that point, Potratz began selling to both Shelton and Bradley, which continued for "[m]aybe a couple months, six weeks." Id. at 31. Potratz later testified the arrangement ended in November 2008. Id. at 32.

Shelton testified she met Bradley at the "end of July, beginning of August," Trial Tr. Vol. 2, 22, and "he moved in within three weeks of us meeting each other." Id. at 14. On cross-examination, she stated, "Lindsey Shoultz moved in my apartment September 1. Joe Bradley moved in, I would say, two weeks after her," or mid-September. Id. at 36. She later confirmed her contact with Bradley started no earlier than sometime in August and ended by the end of October. Id. at 53. However, she clarified she saw Bradley "up until the day I turned myself in to jail," which she believed was November 3, 2008. Id. at 54.

While Potratz and Shelton were often imprecise in their estimation of dates, or even somewhat inconsistent, a review of their testimony confirms the record reflects a basis for the court's decision. See United States v. Payton, 636 F.3d 1027, 1046 (8th Cir. 2011) ("Coconspirators' testimony may be sufficiently reliable evidence upon which the court may base its drug quantity calculation for sentencing purposes.") (internal quotation marks and citation omitted). "Although the district court could have been more explicit, there can be little question, in light of the context, that the district court's drug quantity determination was based on the testimony at trial." United States v. Banks, 494 F.3d 681, 687-88 (8th Cir. 2007). Notably, while Bradley hinges his argument regarding the beginning of the conspiracy on the date he moved into Shelton's apartment, Potratz's testimony demonstrates Potratz was dealing to Bradley "two weeks to a month" before that date. Trial Tr. Vol. 1, 26-27. Moreover, Potratz estimated Bradley was responsible for between nine and twelve ounces of cocaine, either of which would have placed him above the requisite amount for the offense level of 20. Id. at 73.

Nor is Bradley's suggestion he withdrew from the conspiracy on October 22, 2008, supported by the record. See United States v. Spotted Elk, 548 F.3d 641, 672-73 (8th Cir. 2008) ("To withdraw from a conspiracy at common law, a conspirator must show not only that he ceased activities in furtherance of the conspiracy, but also that he either made a 'clean breast' to the government or else communicated the fact of withdrawal to his co-conspirators in a manner reasonably calculated to reach them."). Indeed, both Potratz and Shelton testified they were involved with Bradley through November. In sum, because the record fails to convince us a mistake was made, see United States v. Hill, 638 F.3d 589, 593 (8th Cir. 2011), we affirm the district court's drug quantity findings.

B.    The Minor Participant Reduction

Finally, based on the short duration of Bradley's involvement in the conspiracy and the relatively small amount of cocaine he was held responsible for, Bradley asserts he was entitled to a two-level reduction for being a minor participant under United States Sentencing Guidelines Manual (U.S.S.G.) § 3B1.2. The minor participant adjustment "applies to a defendant . . . who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2, Application Note 5. "Whether a defendant played a minor role is a question of fact reviewed for clear error." United States v. Mitchell, 613 F.3d 862, 870 (8th Cir. 2010). "The burden of proof rests with the defendant to prove that he played a minor role." Id.

Bradley asserts the court erred by comparing his conduct only to Shelton's conduct, as opposed to that of Potratz and Stockman, his co-defendants, and of Potratz's long-time drug associates and co-conspirators – all of whom had a greater involvement in distribution than Bradley. Moreover, Bradley argues Shelton had been buying, using, and selling cocaine and other drugs for almost 10 years. By

comparison, Bradley notes he was involved with Potratz and Shelton for only a handful of weeks in the fall of 2008.

"The propriety of a downward adjustment is determined by comparing the acts of each participant in relation to the relevant conduct for which the participant is held accountable and by measuring each participant's individual acts and relative culpability against the elements of the offense." United States v. Morales, 445 F.3d 1081, 1085 (8th Cir. 2006). Measured against the other participants in the offense, such as Potratz and Stockman, it appears Bradley was less culpable than his co-conspirators. See United States v. Rodriguez-Cruz, 255 F.3d 1054, 1060 (9th Cir. 2001) ("The defendant is to be compared to all participants in the illegal activity, not just to his co-defendants.").

However, while relative culpability of conspirators is relevant to the minor participant determination, "our cases make it clear that merely showing the defendant was less culpable than other participants is not enough to entitle the defendant to the adjustment if the defendant was 'deeply involved' in the offense." United States v. Bush, 352 F.3d 1177, 1182 (8th Cir. 2003). Rather, "[t]o prove the entitlement to the adjustment, the defendant must prove he or she is [a] minor participant by comparison with other participants *and* by comparison with the offense for which he or she was held accountable." Id. (emphasis added). Thus, "[w]e have held that a defendant cannot be considered a minimal participant [where she] had knowledge of the scope and structure of the conspiracy and observed the activities of others in the conspiracy." United States v. Sweeney, 611 F.3d 459, 476 (8th Cir. 2010) (internal quotation marks and citation omitted).

Viewed in this context, Bradley was "deeply involved" in the offense because he was a purchaser and dealer of significant quantities of cocaine. Notably, he was purchasing half-ounce quantities of cocaine from Potratz each week and he maintained his own customer base. Under these facts, "this court has 'consistently rejected the

argument that a distributor of controlled substances deserves a minor-role reduction simply because of the presence of a larger-scale upstream distributor.'" United States v. Carpenter, 487 F.3d 623, 626 (8th Cir. 2007) (quoting United States v. Cubillos, 474 F.3d 1114, 1120 (8th Cir. 2007)) (alteration in original omitted). Because Bradley was actively involved in the conspiracy to distribute cocaine, the district court did not clearly err in finding he was not a minor participant. See United States v. Godinez, 474 F.3d 1039, 1043 (8th Cir. 2007) ("Here, the record demonstrates that [the defendant] was deeply involved in the conspiracy and that his role was essential to the operation. He transported drugs across state lines, stored them at his residence, and sold them."); United States v. Salvador, 426 F.3d 989, 994 (8th Cir. 2005) (concluding there was no clear error in finding the defendant was not a minor player where, despite his lack of decision-making authority, he had an important role in the conspiracy); United States v. Barth, 424 F.3d 752, 763 (8th Cir. 2005) (concluding the defendant was not a minor participant where she was actively involved in the conspiracy to distribute methamphetamine by providing resources, packaging drugs, and collecting money); United States v. Stanley, 362 F.3d 509, 511-12 (8th Cir. 2004) (concluding the defendant was not a minor participant where he distributed drugs many times to several different people, despite the fact he was less culpable than a co-conspirator).

Bradley cites to United States v. Westerman, 973 F.2d 1422, 1428 (8th Cir. 1992), where we held the district court erred in finding the defendant was a minor participant rather than a minimal participant, and therefore the defendant was entitled to an additional two-point reduction in his offense level. Westerman held the defendant's role in the offense had to be measured against his role in the broader context of the mail fraud conspiracy to which he pleaded guilty, rather than just the limited context of the arson conspiracy in which he took an active part. Id. at 1427-28. Based on these facts, Westerman is easily distinguishable from this case because the defendant there had no knowledge of the broader insurance fraud scheme and he was not involved in any planning, and thus he met the definition of a minimal

-13-

participant.  <u>Id.</u> at 1428.  By contrast, Bradley was an active participant in the conspiracy to distribute cocaine, and therefore the court did not clearly err in determining he was not a minor participant.  We affirm the court's rejection of the two-level reduction.

IV

For the foregoing reasons, we affirm Bradley's conviction and sentence.

_____